**Janet DeLynn DICKERSON, Plaintiff,**

**v.**

**James Allen DICKERSON and Southern Electrical Retirement Fund, Defendants.**

**No. CIV-1-91-12.**

United States District Court, E.D. Tennessee.

Aug. 19, 1992.

---

Steven M. Jacoway, Patrick, Beard & Richardson, Chattanooga, Tenn., for plaintiff.

Gerald M. Feder & Robert L. Furst, Feder and Associates, Washington, D.C., and David A. Harrison, Pamela F. Fleenor, Grant, Konvalinka & Grubbs, Chattanooga, Tenn., for Southern Elec. Retirement Fund.

## MEMORANDUM

EDGAR, District Judge.

This action involves a demand by plaintiff Janet Dickerson for the immediate alienation and distribution to her of a portion of her former husband's pension assets under the terms of a divorce decree. Plaintiff and defendant Southern Electrical Retirement Fund ("SERF") have filed cross motions for summary judgment. The Court referred the motions to United States Magistrate Judge Joe Tilson for his report and recommendation pursuant to 28 U.S.C. § 636(b). The magistrate judge has submitted his report which recommends that the plaintiff's motion for summary judgment be denied and that summary judgment be granted in favor of SERF. The magistrate judge disagrees with the holding by the Tennessee Court of Appeals in *Custer v. Custer*, 776 S.W.2d 92 (Tenn. App.1988), *cert. denied*, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989), and concludes that *Custer* was wrongly decided. The Court has reviewed the record and the applicable law *de novo* including the plaintiff's objections to the magistrate judge's report. The Court agrees with and accepts the magistrate judge's findings of fact, conclusions of law, and recommendation pursuant to 28 U.S.C. § 636(b)(1). Because this case presents a significant question of law which is certain to arise again in future litigation and because this Court disagrees with *Custer*, it is necessary to more fully explain the basis for this Court's ruling.

### I. *Facts*

The facts are not in dispute. On January 26, 1990, the Circuit Court of Hamilton County, Tennessee, entered a final decree of divorce which dissolved the marriage of Janet and James Dickerson and divided their marital assets. One of the primary assets accumulated by the parties during their marriage are pension benefits accumulated by James Dickerson as a participant under SERF. Janet Dickerson was granted a judgment against James Dickerson in the amount of $8,000 to be paid out of his pension benefits. In order to aid Janet Dickerson in collecting the $8,000 judgment, the Hamilton County Circuit Court included language in the decree which purports to provide for a qualified domestic relations order ("QDRO") pursuant to 29 U.S.C. § 1056(d). Paragraph 8 of the divorce decree provides in pertinent part:

8. *Qualified Domestic Relations Order.* The Husband currently has certain pension benefits in the Southern Electrical Retirement Fund. Pursuant to the parties division of their martial [sic] property rights and interest, and in order to equitably distribute the marital assets of the parties, Wife, Janet Delynn Dickerson is hereby given a judgment against

James Allen Dickerson in the sum of $8,000. In order to effectuate the Wife's collection of this judgment amount, the Court orders as follows:

(a) *Application of Retirement Equity Act of 1984.* The Court determines that pursuant to the Retirement Equity Act of 1984 (Act), Public Law 98–397, Section 204, $8,000 of James Allen Dickerson retirement benefits under the Southern Electrical Retirement Fund may be disbursed and distributed to Janet Delynn Dickerson pursuant to this order as soon as administratively possible in the form provided in such respective plan.

(b) *Effective Date.* This order is entered as a Qualified Domestic Relations Order, as that term is used in the Act.
. . . .

(e) *Southern Electrical Retirement Fund Pension Plan.* Pursuant to T.C.A. § 34–4–121, and the Retirement Equity Act of 1984, the Court determines that all vested benefits to which James Allen Dickerson is entitled as a participant under the Southern Electrical Retirement Fund is marital property subject to equitable division of this Court and further is subject to application by this Court to satisfy the parties' division of martial [sic] assets and adjustment of martial [sic] rights. As part of the overall equitable division of assets entered into in this cause, the Court awards to Janet Delynn Dickerson, as alternate payee, the right to receive $8,000 of those vested benefits to which James Allen Dickerson is entitled as a participant under the Southern Electrical Retirement Fund. Such benefits in the sum of $8,000 shall be distributed to Janet Delynn Dickerson as quickly as administratively possible following the entry of the Final Decree of Divorce. The distribution to Janet Delynn Dickerson shall be in a lump sum payment or other form as provided in the Southern Electrical Retirement Fund.

(f) This Qualified Domestic Relations Order does not require the Southern Electrical Retirement Fund to provide any type or form of benefit not otherwise provided under the Southern Electrical Retirement Fund; nor does this Qualified Domestic Relations Order require the Southern Electrical Retirement Fund to provide increased benefits to the participant or any alternate payee; nor does this Qualified Domestic Relations Order require that payment to an alternate payee of plan benefits which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

After entry of the final divorce decree, Janet Dickerson requested SERF to distribute the $8,000 in pension assets to her. SERF refused to comply with the request because SERF contends that such a distribution of pension funds would violate § 206(d) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1056(d), and §§ 401(a)(13) and 414(p) of the Internal Revenue Code, 26 U.S.C. §§ 401(a)(13) and 414(p) which impose strict limitations on the alienation of pension funds.

The SERF pension plan contains the following provision concerning the alienation and assignment of benefits:

### ELIGIBILITY FOR BENEFITS

#### Normal Retirement

Any Employee who retires from Covered Employment and Industry Employment will be eligible for a Normal Retirement benefit upon achieving his 55th (fifty-fifth) birthday.

#### Disability Retirement

An Employee who leaves Covered Employment and Industry Employment because of Disability ... shall be eligible for a Disability Retirement benefit.
. . . .

May my benefits be assigned?
Benefits payable under the Plan are not subject in any manner to sale, transfer, alienation, pledge or any other type of assignment of benefits, voluntary or involuntary, except by a qualified domestic relations order. A qualified domestic relations order is a judgment made under a

state domestic relations law relating to the provision of child support, alimony payments or marital property rights. In order to qualify as a domestic relations order, a judgment is subject to other requirements regarding appropriate notification to the Fund by the court and the manner in which your benefits are assigned by the court.

Under the SERF plan there are only two benefit options for participants, the normal retirement benefit and the disability retirement benefit. The earliest age that the participant, James Dickerson, is eligible to receive normal retirement benefits is fifty-five provided he has terminated his employment. According to SERF's records, James Dickerson was born on October 21, 1958, and he will be eligible for normal retirement benefits no earlier than October 21, 2013.

Janet Dickerson filed a motion in the state court to add SERF as a party to the divorce action as a means of challenging SERF's refusal to distribute the pension assets to her and the motion was granted. Janet Dickerson also moved the state court to order SERF to show cause why it should not be held in contempt for failing to comply with the divorce decree requiring SERF to distribute $8,000 in pension assets to her. The state court issued a show cause order to SERF. SERF thereafter removed the case invoking this Court's subject matter jurisdiction under ERISA, 29 U.S.C. § 1132(e)(1). SERF essentially requests this Court to issue a declaratory judgment that the divorce decree does not comply

with the statutory requirements to constitute a QDRO pursuant to § 1056(d).

## II. *Analysis*

The question to be resolved is whether the divorce decree is a QDRO within the meaning of 29 U.S.C. § 1056(d) which entitles Janet Dickerson to have SERF disburse $8,000 from the pension plan to her as an alternate payee-beneficiary. After reviewing the plain statutory language and the legislative history of § 1056(d), the Court concludes that the divorce decree is not a QDRO and summary judgment will be entered in SERF's favor.

ERISA, as originally enacted, contains a spendthrift provision which states that benefits provided under covered retirement pension plans may not be alienated or assigned. § 1056(d)(1). The purpose of the spendthrift provision is to protect and secure the financial well-being of employees and their dependents.[1] *Ablamis v. Roper*, 937 F.2d 1450, 1453–54 (9th Cir.1991). However, ERISA was flawed in that it did not clearly delineate a spouse's interest in an employee's pension benefits. "The statutory confusion often left women who worked in the home and contributed significantly to the family's financial security without the ability to obtain any pension benefits upon their husband's death or upon divorce." *Id.* at 1453. Congress, therefore, enacted the Retirement Equity Act of 1984 ("REA"), Pub.Law 98–397, 98 Stat. 1426 (1984), primarily for the purpose of safeguarding the financial security of widows and divorcees. *Id.*[2]

1. In *Guidry v. Sheet Metal Workers National Pension Fund*, 493 U.S. 365, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990), the Supreme Court asserted than any exceptions to the spendthrift provision must be expressly mandated by Congress. *Guidry* concluded that ERISA's prohibition on the assignment and alienation of pension benefits under § 1056(d)(1) reflects a considered congressional policy choice to safeguard a stream of retirement income for pensioners and their dependents. *Id.* at 376, 110 S.Ct. at 687.

2. In the legislative history of the REA, it is noted that ERISA was amended to

provide for greater equity under private pension plans for workers and their spouses ...

by taking into account changes in work patterns, the status of marriage as an economic partnership, and the substantial contribution to that partnership of spouses who work both in and outside the home.

S.Rep. No. 575, 98th Cong.2d Sess. (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News 2547. The Senate Report also observed that "the assignment of [an] alternate payee's rights to the benefits is not considered an assignment or alienation of benefits under the plan if and only if the order is a qualified domestic relations order," and that state law providing these rights under a QDRO would be exempt from federal pre-emption. *Id.* at 2565.

In order to protect the interests of women who may suffer inequities as the economic victims of divorce or separation from their wage earning husbands, the REA creates an express statutory exception to the spendthrift provision. ERISA's spendthrift provision does not apply to a QDRO. A court may divide the rights of spouses in pension benefits through a QDRO and award the non-employee spouse her proper share of those benefits.

There is no dispute between Janet Dickerson and SERF about the state court's authority to issue a QDRO. The controversy is that SERF contends the divorce decree is not a QDRO because it seeks to order SERF to pay the $8,000 in pension funds to Janet Dickerson now instead of delaying payment until such time as her former husband becomes eligible at age 55 to receive a regular distribution of benefits under the terms of the SERF plan. Janet Dickerson cites *Custer* and claims that the divorce decree is a QDRO which entitles her to an immediate distribution of $8,000 to her from SERF even though her former husband is approximately twenty-one years away from being entitled to receive normal retirement benefits under the SERF plan.

29 U.S.C. § 1056(d) provides in part:

(1) Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.

. . . .

(3)(A) Paragraph (1) shall apply to the creation, assignment, or recognition of a right to any benefit payable with respect to a participant pursuant to a domestic relations order, except that paragraph (1) shall not apply if the order is determined to be a qualified domestic relations order. Each pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.

(B) For purposes of this paragraph—

(i) the term "qualified domestic relations order" means a domestic relations order—

(I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and

(II) with respect to which the requirements of subparagraphs (C) and (D) are met, and

(ii) the term "domestic relations order" means any judgment, decree, or order (including approval of a property settlement agreement) which—

(I) relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and

(II) is made pursuant to a State domestic relations law (including a community property law).

(C) A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies—

(i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,

(ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,

(iii) the number of payments or period to which such order applies, and

(iv) each plan to which such order applies.

(D) A domestic relations order meets the requirements of this subparagraph only if such order—

(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,

(ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and

(iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

(E)(i) A domestic relations order shall not be treated as failing to meet the requirements of clause (i) of subparagraph (D) solely because such order requires that payment of benefits be made to an alternate payee—

(I) in the case of any payment before a participant has separated from service, on or after the date on which the participant attains (or would have attained) the earliest retirement age,

(II) as if the participant had retired on the date on which such payment is to begin under such order (but taking into account only the present value of benefits actually accrued and not taking into account the present value of any employer subsidy for early retirement), and

(III) in any form in which such benefits may be paid under the plan to the participant (other than in the form of a joint and survivor annuity with respect to the alternate payee and his or her subsequent spouse).

. . . .

(ii) For purposes of this subparagraph, the term "earliest retirement age" means the earlier of—

(I) the date on which the participant is entitled to a distribution under the plan, or

(II) the later of the date of the participant attains age 50 or the earliest date on which the participant could begin receiving benefits under the plan if the participant separated from service.

Janet Dickerson contends that § 1056(d)(3)(E)(ii)(I) entitles her to receive an immediate distribution of pension benefits from SERF on the theory that the divorce decree found her to be a "participant" under the SERF plan. She urges the Court to interpret § 1056(d)(3)(E)(ii)(I) to mean that earliest retirement age is the date on which the plan participant, Janet Dickerson, is entitled to a distribution under the pension plan and she contends the divorce decree is a QDRO which provides that she has a right to be paid by SERF "as quickly as administratively possible." This argument is without merit because the divorce decree never refers to Janet Dickerson as being a "participant" under the SERF plan. The divorce decree states that James Dickerson is the participant and Janet Dickerson is the alternate payee. Moreover, Janet Dickerson is not a "participant" within the meaning of that term as defined under ERISA.[3] As the former spouse of the SERF plan participant, Janet Dickerson is merely an alternate payee or beneficiary.[4]

Janet Dickerson next argues the divorce decree is a valid QDRO under § 1056(d)(3)(E)(i)(II) which provides a QDRO may require that payment of benefits be made to an alternate payee "as if the participant had retired on the date on which such payment is to begin under such order. . . ." She contends that the event which triggers the distribution of SERF pension benefits to her is the divorce decree rather than James Dickerson becoming eligible to receive normal retirement benefits at age fifty-five. The Court disagrees with this reasoning. A self-proclaimed QDRO does not in and of itself create a right in an alternate payee to obtain pension benefits. Rather, the legal sufficiency of the divorce decree is tested by the provisions of § 1056(d) to determine if it meets the statutory requirements to

**3.** 29 U.S.C. § 1002(7) provides:

The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

**4.** 29 U.S.C. § 1056(d)(3) provides in part:

(J) A person who is an alternate payee under a qualified domestic relations order shall be considered for purposes of any provision of this chapter a beneficiary under the plan. . . .

(K) The term "alternate payee" means any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant.

constitute a true QDRO and properly allow access to the participant's pension benefits. The Tennessee Court of Appeals addressed this same question in *Custer*, 776 S.W.2d 92. The parties have not cited, nor has the Court found, any other reported case authority on the subject.

The facts in *Custer* are virtually identical to the present case. The Chancery Court in Hamilton County, Tennessee, entered a divorce decree approving a property settlement agreement which awarded $11,236.55 of Mr. Custer's pension to his wife. Mr. Custer was thirty-two years old and his pension monies were administered by SERF. When SERF refused to disburse the pension money, the wife filed a petition to show cause why SERF should not be held in contempt for violating the divorce decree. SERF moved to dismiss the show cause petition on the ground that ERISA prohibited distribution of the pension funds. The Chancery Court overruled SERF's motion and ordered it to immediately disburse the money to the wife in accordance with the divorce decree.

On appeal, SERF argued that where a pension participant is not eligible to receive any benefits until age 55, the earliest effective date for a QDRO and the earliest date on which the wife can receive her share of her husband's benefits is the husband-participant's 55th birthday. The Tennessee Court of Appeals ruled in favor of Mrs. Custer against SERF and held:

> Thus, contrary to Fund's argument, disbursement of retirement plan funds to a nonparticipant spouse in compliance with a QDRO is not contingent upon the age of the participant spouse at the time the funds are to be distributed. Since the Custers' divorce decree is a "Qualified Domestic Relations Order" as defined by ERISA in 29 U.S.C. § 1056(d)(3), the wife may receive the fund awarded to her by the court's decree "as if the participant [the husband] had retired on the date on which such payment is to begin." 29 U.S.C. § 1056(d)(3)(E)(i)(II) (1985).

*Id.* at 95.

This Court respectfully disagrees with the holding in *Custer*. As the magistrate judge explains in his report and recommendation, the intent of Congress in enacting ERISA was to protect the fiscal integrity of covered pension plans for the benefit of *all* of their participants. To this end, Congress imposed strict actuarial planning and reporting requirements along with a prohibition against assignment or alienation of the interests of individual participants. If the courts were to allow divorce decrees of participants entered many years prior to their normal retirement dates to cause sudden, unanticipated and immediate withdrawals from pension funds, it would be in contravention of the fundamental purpose of ERISA. If Congress had intended to make a drastic departure from its previous spendthrift policy when it enacted the REA and provided for the utilization of QDROs, as Janet Dickerson suggests, then the intent should be abundantly clear in both the plain statutory language and the legislative history of the REA. The Court concludes that such intent is not evident in either source.

The operative language in § 1056(d)(3)(E)(i)(II) is "as if the participant had *retired....*" (Emphasis added). This subparagraph, when read in context with § 1056(d)(3)(E)(i)(I), presumes that the participant has reached the age where he is eligible to receive retirement benefits under the terms of his pension plan, but he has not actually retired or terminated his employment. This interpretation of the statute is supported by the pertinent legislative history. In explanation of the intent of Congress with regard to the combined effect of 29 U.S.C. §§ 1056(d)(3)(D) and (E), the Senate Finance Committee reported:

> A domestic relations order is not a qualified order if it (1) requires a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,.... The bill provides that a domestic relations order is not treated as failing the requirements for a qualified domestic relations order merely because the order provides that payments must begin to the alternate payee on or after the date on which the participant attains the earliest retirement age under the

**134**

plan whether or not the participant actually retires on that date.... In the case of an order providing for the payment of benefits *after* the earliest retirement age, the payments to the alternate payee at that time are computed *as if the participant had retired on the date on which benefit payments commence under the order.*

S.Rep. No. 575, 98th Cong.2nd Sess. 1 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2566–67 (emphasis supplied).

The Court has also considered the following excerpt from the legislative history of the Tax Reform Act of 1986, P.L. 99–514, 100 Stat. 2085 (1986), wherein Congress discussed the REA:

*Qualified domestic relations orders.*—Under present law, a domestic relations order is not a qualified domestic relations order ("QDRO") if such order requires a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan. Thus, an order generally constitutes a QDRO if it provides that payments attributable to a participant's benefits are to begin before the participant separates from service and becomes eligible for a distribution. *As an exception to the rule, present law provides that a QDRO may require that an alternate payee commence receiving payments on or after the date that the participant attains the earliest retirement age under the plan, even if the participant has not yet separated from service.*

Under the conference agreement, the definition of "earliest retirement age" for purposes of the QDRO provisions in the case of a defined contribution plan or a defined benefit plan is the earlier of: (1) the earliest date benefits are payable under the plan to the participant, and (2) the later of the date the participant attains age 50 and the date on which the participant could obtain a distribution from the plan if the participant separated from service.

For example, in the case of a plan which provides for payment of benefits upon separation from service (but not before then), the earliest date on which a QDRO can require payments to an alter-

nate payee to begin is the date the participant separates from service. A QDRO could also require such a plan to begin payments to an alternate payee when the participant attains age 50, even if the participant has not then separated from service. The amount payable under a QDRO following the participant's earliest retirement age cannot exceed the amount which the participant is (or would be) entitled to receive at such time. For example, assume that a profit-sharing plan provides that a participant may withdraw some, but not all, of the participant's account balance before separation from service. A QDRO may provide for payment to an alternative payee up to the amount which the participant may withdraw.

*A plan may provide for payment to an alternate payee prior to the earliest retirement age as defined under the conference agreement.*

H.R.Conf.Rep. No. 99–841, 99th Cong.2nd Sess. (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4945–46 (emphasis supplied).

After reviewing the plain language of § 1056(d) and the pertinent legislative history, the Court concludes that the divorce decree dissolving the marriage of James and Janet Dickerson is not a qualified domestic relations order because it seeks to require SERF to provide a benefit not otherwise permitted under the pension plan and to disburse pension funds to the alternate payee spouse prior to participant James Dickerson reaching age 55 which is the earliest retirement age when he is eligible to begin receiving normal retirement benefits under the terms of the SERF plan.

An order will enter granting summary judgment in favor of SERF. If Janet Dickerson desires to have the terms of her divorce decree modified to provide for a qualified domestic relations order which complies with 29 U.S.C. § 1056(d), it will be necessary for her to initiate proceedings in the Hamilton County Circuit Court.